Margaret **WHITECOTTON**, by her next friends, Kay **WHITECOTTON** and Michael Whitecotton, Petitioners–Appellants,

v.

**SECRETARY OF HEALTH AND HUMAN SERVICES,**
Respondent.

Nos. 92–5083, 93–5101.

United States Court of Appeals,
Federal Circuit.

April 16, 1996.

Rehearing Denied;
Suggestion for Rehearing
In Banc Declined June 26, 1996.

Andrew J. Pincus, Mayer, Brown & Platt, Washington, D.C., argued for petitioners-appellants. With him on the brief was Curtis R. Webb, Twin Falls, Idaho.

Karen P. Hewitt, Attorney, Department of Justice, Washington, D.C., argued for respondent. With her on the brief were Frank W. Hunger, Assistant Attorney General, Helene M. Goldberg, John Lodge Euler and Charles R. Gross, Attorneys.

Before RICH, NEWMAN, and CLEVENGER, Circuit Judges.

CLEVENGER, Circuit Judge.

This case returns to us on remand from the Supreme Court which reversed our decision awarding Margaret Whitecotton compensation under the Vaccine Act. *Shalala v. Whitecotton*, —— U.S. ——, 115 S.Ct. 1477, 131 L.Ed.2d 374 (1995). The Supreme Court left open several issues for us to decide on remand. As a result of our decision on the remaining issues, we affirm-in-part and reverse-in-part the decision of the United States Court of Federal Claims [1] which affirmed the special master's denial of Margaret Whitecotton's claim, and remand the case to the special master to make certain additional findings of fact.

I

Margaret Whitecotton (Maggie) was born on April 22, 1975. Maggie was borderline microcephalic [2] at birth, and within a few months of birth she had become clearly so. Other than her microcephaly, Maggie displayed few abnormal symptoms during her early months. Maggie rolled over from her stomach to her back at two weeks of age. Although sometimes indicative of spasticity,[3] in Maggie's case the inference is doubtful because no other contemporaneous evidence supports such a conclusion. Maggie also has had difficulty swallowing from birth, a symptom often associated with children who later suffer from cerebral palsy and mental retardation.

On August 18, 1975, Maggie received her third Diphtheria–Pertussis–Tetanus (DPT) vaccination. Following the shot, Maggie suffered a series of clonic [4] seizures. The next day she suffered similar additional seizures for which she was hospitalized. She also experienced projectile vomiting within hours of her vaccination. In addition, an EEG taken seven days after Maggie's third DPT shot showed, for the first time, slow and poorly organized brain activity.

Other contemporaneous evidence, however, counterbalances the symptomology described above. Specifically, Maggie's discharge diagnosis at the conclusion of her hospitalization included the following physical examination results:

The HEENT [5] examination appeared to be normal. The remainder of the physical examination was unremarkable. Neurological examination revealed the patient to be alert, follow objects with her eyes past midline, trying to reach for the objects with both hands. Motor examination revealed good activity in all motor groups. The tone, though difficult to assess, appeared to be normal. Muscle stretch reflexes were normoactive and equal bilaterally.

In the several months following her vaccination, Maggie's development was slow but steady. During this period, for example, Maggie learned to sit, crawl and, to some

---

1. The United States Claims Court was renamed the Court of Federal Claims on October 29, 1992, during the course of the proceedings in this case before that court. Federal Courts Administration Act of 1992, Pub.L. No. 102–572, § 902(a), 106 Stat. 4506, 4516. We use the court's present name.

2. "Microcephalic" means: "having a small head." *Stedman's Medical Dictionary* 965 (William R. Hensyl ed., 25th ed.1990) (hereinafter Stedman's Medical Dictionary). As will be explained in greater detail below, children who are formally diagnosed with microcephaly generally have a head size more than two standard deviations below the mean.

3. "Spasticity" means: "A state of increased muscular tone with exaggeration of the tendon reflexes." *Id.* at 1441.

4. "Clonic" means: "Relating to or characterized by clonus; marked by alternate contraction and relaxation of muscle." *Id.* at 318. "Clonus" means: "a form of movement marked by contractions and relaxations of a muscle, occurring in rapid succession." *Id.*

5. "HEENT" is an acronym for "Head, Ears, Eyes, Nose, Throat." 1 *Acronyms, Initialisms & Abbreviations Dictionary* (Mary Rose Bonk, ed., 20th ed.1995).

extent, pull herself up. She was thought to be hypertonic [6] intermittently, but the onset of her hypertonicity was gradual. An EEG taken one month after her DPT shot found that Maggie's responses had returned to within normal limits.

Notwithstanding this development, Maggie was not an ordinary healthy baby. In February 1976, she was hospitalized for ten days with a possible seizure disorder after she became still, flaccid, and pale. Her EEG, however, was normal, and she did not suffer from any seizures while in the hospital. At around this time, Maggie was formally diagnosed with microcephaly and cerebral palsy.[7] In January 1977, Maggie developed a fever of about 104 degrees in connection with an upper respiratory infection and was diagnosed with a febrile convulsion.[8] On August 28, 1979, Maggie went limp and her eyes rolled. Although the exact cause of her symptoms on that occasion was never determined, her doctors thought that the symptoms were caused by choking secondary to mucus in her throat. Also, on March 21, 1980, the day after receiving a diphtheria-tetanus (DT) vaccination, Maggie suffered a grand mal [9] seizure.

Today, Maggie is severely disabled both mentally and physically. She has cerebral palsy and is non-ambulatory. Her vocabulary is very limited. She is, for all practical purposes, totally dependent on others for her needs.

## II

The National Childhood Vaccine Injury Act of 1986 (Vaccine Act) provides an alternative to the traditional tort system for individuals who have suffered vaccine-related injuries. The Act permits petitioners to recover compensation for their vaccine-related injuries under two distinct legal theories.

The first is actual causation. If petitioner can show to a preponderance that the vaccine was the cause of her injuries, then she is entitled to compensation under the Act. 42 U.S.C. §§ 300aa–11(c)(1)(C)(ii), 300aa–13(a)(1)(A).

The burden of showing causation, however, is heavy. Therefore, Congress provided a second method of obtaining compensation. The Act provides a "Vaccine Injury Table" which lists various injuries associated with each vaccine, and provides a time period with respect to each injury associated with each vaccine. 42 U.S.C. § 300aa–14. To prevail under this second theory, a petitioner must show that she experienced the first "symptom or manifestation" of a table injury, within the table time period following the vaccination. *See* 42 U.S.C. § 300aa–11(c)(1)(C)(i). If petitioner can make such a showing, causation is presumed and petitioner is deemed to have made out a *prima facie* case of entitlement to compensation under the Act. *See* 42 U.S.C. § 300aa–13(a)(1)(A). The burden of going forward then shifts to the government which must pay compensation unless it can show to a preponderance that a "factor unrelated" to the vaccine was the actual cause of petitioner's injuries. *See* 42 U.S.C. § 300aa–13(a)(1)(B).

In addition to providing compensation for those who suffer the initial onset of a table injury within the table time period following a vaccination, the statute also permits recovery if an individual suffers a significant aggravation of a table injury within the statutory time period. Congress provided for compensation in such cases:

> in order not to exclude serious cases of illness because of possible minor events in the person's past medical history. This provision does not include compensation for conditions which might legitimately be

---

6. "Hypertonic" means: "Spastic (1); having a greater degree of tension." Stedman's Medical Dictionary at 746. "Hypertonia" means: "extreme tension of the muscles or arteries." *Id.*

7. "Cerebral Palsy" is a: "defect of motor power and coordination related to damage of the brain." *Id.* at 1124.

8. A "febrile convulsion" is a: "violent spasm or series of jerkings of the face, trunk, or extremi-

ties in infancy or early childhood, associated with fever." *Id.* at 349.

9. "Grand mal" is defined as: "Tonic-clonic generalized epilepsy." *Id.* at 667. "Tonic" means: "In a state of continuous unremitting action; denoting especially a muscular contraction." *Id.* at 1608.

described as pre-existing (e.g., a child with monthly seizures who, after vaccination, has seizures every three and a half weeks), but is meant to encompass serious deterioration (e.g., a child with monthly seizures who, after vaccination, has seizures on a daily basis).

H.R. Rep. 908, 99th Cong.2d Sess. 1, *reprinted in* 1986 USCCAN 6287, 6356. The statutory requirements to make out a *prima facie* significant aggravation claim are analogous to those required to make out a *prima facie* initial onset claim. Petitioner must show that she suffered the first symptom or manifestation of the significant aggravation of a table injury within the table time period following her vaccination. 42 U.S.C. § 300aa–11(c)(1)(C)(i).

### III

On July 24, 1990, petitioners Kay and Michael Whitecotton, Maggie's parents, filed a claim under the Vaccine Act in the United States Court of Federal Claims seeking compensation for injuries allegedly suffered by Maggie as a result of her DPT vaccination. The court referred Maggie's case to a special master who conducted a hearing at which both petitioners and respondents presented evidence including the testimony of experts.

Before the special master, petitioners asserted that Maggie had suffered the initial onset of a table encephalopathy [10] within the three-day table time period of her third DPT shot.[11] Petitioners did not formally allege that a preexisting encephalopathy was significantly aggravated within the table time period, but the special master nevertheless also examined whether Maggie was entitled to compensation under a significant aggravation theory.

The special master denied Maggie's claim under both the initial onset and significant aggravation theories. With respect to the initial onset theory, the special master denied Maggie's claim because her small head size indicated that she was already encephalopathic at the time of her vaccination. At the hearing, the experts disputed the point below which a person with a small head should be formally diagnosed as microcephalic. Most of the testimony indicated that a head size at or below two standard deviations from the mean warrants a diagnosis of microcephaly. Some of the testimony supported a looser standard which would define a patient as microcephalic only if the patient's head was more than three standard deviations below the mean. The special master adopted the more commonly accepted definition of two standard deviations below the mean, and under that definition found that Maggie was "at least borderline microcephalic at birth and ... clearly microcephalic by the time she received her third DPT shot on August 18, 1975." The special master further found, on the basis of expert testimony, that Maggie's microcephaly indicated that Maggie was already encephalopathic prior to August 18, 1975, the date of her third DPT shot. Since she was already brain damaged on the day of the shot, the post-vaccination symptoms could not constitute the "first symptom or manifestation" of her encephalopathy, as required by the statute.

With respect to the significant aggravation theory, the special master denied Maggie compensation on the basis of the analysis which had only recently been developed by the Court of Federal Claims in the case of *Misasi v. Secretary of Department of Health & Human Services*, 23 Cl.Ct. 322 (1991). In

---

**10.** The Vaccine Act defines "encephalopathy" as: "any significant acquired abnormality of, or injury to, or impairment of function of the brain. Among the frequent manifestations of encephalopathy are focal and diffuse neurologic signs, increased intracranial pressure, or changes lasting at least 6 hours in level of consciousness, with or without convulsions. The neurological signs and symptoms of encephalopathy may be temporary with complete recovery, or may result in various degrees of permanent impairment. Signs and symptoms such as high pitched and unusual screaming, persistent unconsolable crying, and

bulging fontanel are compatible with an encephalopathy, but in and of themselves are not conclusive evidence of encephalopathy. Encephalopathy usually can be documented by slow wave activity on an electroencephalogram." 42 U.S.C. § 300aa–14(b)(3)(A).

**11.** Before the special master, petitioners also asserted that Maggie had suffered a table seizure disorder within the statutory table time period. The special master's denial of this aspect of Maggie's claim is not at issue on this appeal.

*Misasi*, the court attempted for the first time to articulate a legal construct for handling significant aggravation cases. Under the *Misasi* framework, to evaluate whether a person has suffered a significant aggravation of a preexisting condition, the court must: (1) assess the individual's condition prior to administration of the vaccine, i.e., evaluate the nature and extent of the individual's preexisting condition, (2) assess the individual's current condition after administration of the vaccine, (3) predict the individual's condition had the vaccine not been administered, and (4) compare the individual's current condition with the predicted condition had the vaccine not been administered. Only if the person's current condition is significantly worse than the person's predicted condition had the vaccine not been administered, is the person entitled to compensation under the significant aggravation theory as explained in *Misasi*, 23 Cl.Ct. at 324.

Applying the *Misasi* framework to the facts of Maggie's case, the special master concluded that even absent the vaccine, Maggie would have been mentally retarded and might have suffered from cerebral palsy. As a result, the special master concluded that there was no reason to believe that Maggie's condition would have been any different had the vaccine not been administered, and he consequently denied Maggie's significant aggravation claim.

After the Court of Federal Claims affirmed the special master's decision, the Whitecottons appealed to this court. Unlike the Court of Federal Claims, we concluded from our analysis of the statutory scheme that a petitioner could make out an initial onset table injury claim even if petitioner had exhibited a symptom or manifestation of a table injury prior to the vaccination. *Whitecotton v. Secretary of Dep't of Health & Human Servs.*, 17 F.3d 374, 376–77 (Fed.Cir.1994). As a result, we found that Maggie's post-vaccination symptoms entitled her to compensation notwithstanding her preexisting microcephaly.

The Supreme Court granted certiorari, and reversed. *Whitecotton*, —— U.S. at ——, 115 S.Ct. at 1481. Writing for the majority, Justice Souter disagreed with our assertion that a petitioner may recover on an initial onset theory if she had exhibited symptoms or manifestations of her post-vaccination injury prior to vaccination. *See id.* at ——, 115 S.Ct. at 1480. Consequently, the Court held, demonstration of symptoms within the table time period is insufficient, in itself, to make out a *prima facie* case of entitlement under the Act. In addition, the petitioner must show that she exhibited no symptom or manifestation of the injury before the vaccination. *See id.*

In her concurring opinion, Justice O'Connor highlighted the scope of the Supreme Court's decision. Justice O'Connor noted that the Court's decision articulated the essential elements of a *prima facie* initial onset table case. It did not, however, address the Whitecotton's challenges to the special master's fact findings with respect to whether Maggie's microcephaly indeed constituted a first manifestation of her encephalopathy. *Id.* at ——, 115 S.Ct. at 1482 (O'Connor, J., concurring). Nor did it address any legal or factual challenges to the special master's denial of Maggie's significant aggravation claim. *Id.* at —— —— ——, 115 S.Ct. at 1482–83. We consider these unresolved issues on remand.

## IV

■ Our review of the special master's findings of fact is very limited. As we have recognized in the past, "Congress assigned to a group of specialists, the Special Masters ..., the unenviable job of sorting through these painful cases and, based upon their accumulated expertise in the field, judging the merits of the individual claims." *Hodges v. Secretary of Dep't of Health & Human Servs.*, 9 F.3d 958, 961 (Fed.Cir.1993). For this reason, Congress has instructed us to affirm a special master's factual findings unless they are arbitrary, capricious, or an abuse of discretion. *See Knudsen v. Secretary of Dep't of Health & Human Servs.*, 35 F.3d 543, 546–47 (Fed.Cir.1994).

■ We also note that in deciding this case, we may consider only the record developed in the proceedings below. *Hodges*, 9 F.3d at 962. Thus, studies that were not

before the special master are not appropriate for consideration on appellate review. *Id.* In their brief, petitioners cite several studies which purport to show that any link between microcephaly and brain damage is tenuous, at best. These studies were not before the special master.[12] We cannot incorporate scientific studies cited for the first time on this appeal into our review of the special master's findings because doing so would amount to retrying petitioner's case before this appellate tribunal. Neither the statute, nor common sense, permit this. *Compare* 42 U.S.C. § 300aa–12(e) (stating that Court of Federal Claims, on review of special master's decision, can issue its own findings of fact) *with* 42 U.S.C. § 300aa–12(f) (stating that authority of Federal Circuit on appeal is to review findings of fact of Court of Federal Claims).

■ The special master denied the initial onset prong of Maggie's petition because he found that Maggie's microcephaly constituted a pre-vaccination manifestation of an encephalopathy. In reaching this conclusion, the special master relied on substantial expert testimony as well as the medical literature available to him at the time of the hearing. Indeed, it was the opinion of the Whitecottons' own expert witness, Dr. Slater, that:

> It is the growth of the brain which promotes the growth of the skull. [Maggie's] recorded head circumferences would indicate that her brain grew along its normal curve, albeit small, through the first three months of life. She then suffered impaired brain growth, and her head circumference fell off its normal curve. This is termed secondary microcephaly, and implies a post partum injury to the brain, at or near three months of age.

Based on the evidence presented at the hearing, the special master concluded that the preponderance of the evidence indicated that Maggie was already encephalopathic before her third DPT shot. Supported, as it was, by substantial expert testimony, this finding is not arbitrary and capricious, nor does it constitute an abuse of discretion. We therefore affirm the special master's denial of Maggie's initial onset claim.

## V

Before examining the special master's denial of Maggie's significant aggravation claim, we pause to review the state of the law with respect to this difficult concept. The Vaccine Act created an entirely new area of law just 10 years ago. Of the concepts embodied in the Vaccine Act, one of the most slippery and difficult to apply is that of "significant aggravation." It is therefore not surprising that the jurisprudential development of significant aggravation has not been without complication. Instead, the concept has evolved fitfully as the Court of Federal Claims has struggled to come to grips with this new and not-well-developed legal notion.

*Misasi* constituted the Court of Federal Claims' initial attempt to formulate a legal construct for deciding claims of significant aggravation. That opinion recognized that the primary difficulty in adjudicating the significant aggravation claims of children with a pre-existing condition, is that it is very difficult to know at the age when a child is vaccinated what symptoms would have naturally manifested themselves as the child matured and what symptoms might have remained latent absent the vaccination. *See id.* at 327 ("One conclusion that is apparent from a study of the medical testimony is that even in the absence of a DPT inoculation, it is very difficult to predict the ultimate physical and mental status of a hypotonic OCD child less than two months old."). In order to deal with this difficulty, *Misasi* articulated the four-part inquiry described above in Part III of this opinion. That inquiry compares the actual condition of the child after the vaccination with the child's predicted condition had the vaccine not been administered. If the child's current condition represents a significant aggravation of the child's expected condition, then the child is entitled to the presumption of compensation under a significant aggravation theory. In this way, *Misasi* reasoned, it is possible to distinguish cases in which the vaccination caused the significant aggravation from cases in which the vaccination had no detrimental effect.

---

12. In fact, in contrast to the studies cited by petitioners, the medical literature before the special master indicated that over 90% of microcephalic children were encephalopathic.

Within months, however, the Court of Federal Claims recognized that, read literally, *Misasi* did not accurately reflect the distribution of burdens of proof and of going forward dictated by the statutory language of the Vaccine Act. Specifically, strictly applied, the *Misasi* framework improperly required petitioners to prove that the post-vaccination aggravated symptoms would not have occurred absent the vaccination, instead of merely requiring petitioners to show that the first symptom or manifestation of the aggravation took place within the table time period following the inoculation. Effectively, then, *Misasi* required petitioners to show that the vaccine had caused the aggravation of their injuries. This contradicted the statutory table-injury scheme whose purpose was to remove from petitioners the difficult burden of proving causation.

Rather than discard *Misasi* entirely, however, the Court of Federal Claims instead shifted its application from petitioners' *prima facie* case, where *Misasi* improperly denied petitioners the benefit of the statutory presumption of causation, to petitioners' rebuttal case, where petitioners properly bear the burden of showing causation. For example, in *O'Connor v. Secretary of Department of Health & Human Services*, 24 Cl.Ct. 428, 429 n. 2 (1991), *aff'd*, 975 F.2d 868 (Fed.Cir.1992) (citations omitted), the court applied *Misasi*, but noted in a footnote:

> As a matter of clarification, this court notes that the *Misasi* standard should not be construed as altering the petitioners' initial burden when demonstrating presumed causation under [the statute]. In making a *prima facie* showing of presumed causation, petitioners need not prove causation or disprove possible alternative causes for the deterioration in the child's preexisting condition following the vaccination. The *Misasi* standard is implicated only after the respondent has met its burden under [the statute] of showing an actual alternative cause, *i.e.*, the natural progression of the preexisting condition rather than the vaccination. The burden then necessarily shifts to petitioners to rebut by demonstrating causation or by discrediting the respondent's evidence.

Similarly, in *Reusser v. Secretary of Department of Health & Human Services*, 28 Fed. Cl. 516, 527–28 (1993), the court perceptively explained:

> The *Misasi* test, as modified [by cases like *O'Connor*], does not alter the petitioner's initial burden of proof as set forth in [the statute]. With respect to Table cases, the petitioners' burden ... is to prove, by a preponderance of the evidence, that the claimant sustained or significantly aggravated an injury listed on the Vaccine Injury Table and that the onset or significant aggravation of the injury occurred within the time period prescribed by the Table. [Citation omitted].... It is for this reason that the *Misasi* test, which essentially involves proving that the cause of the injury sustained is *not* due to a pre-existing condition, is an inappropriate test to evaluate whether a petitioner has succeeded in proving a *prima facie* case under [the statute]. The *Misasi* test is better applied to those significant aggravation cases where the petitioner successfully makes a showing of presumed causation under [the statute] and the respondent successfully rebuts that presumption ... by proving that the injury is instead due to a pre-existing condition. In such a case, the burden then shifts back to petitioners to rebut the respondent's showing....

■ With respect to questions of law, our review of the Court of Federal Claims' judgment is de novo. *See Euken v. Secretary of Dep't of Health & Human Servs.*, 34 F.3d 1045, 1047 (Fed.Cir.1994). We agree with the court's analysis in *Reusser* and *O'Connor* that, as originally conceived, the *Misasi* test improperly required a petitioner to prove, as part of her *prima facie* case, that petitioner's significant aggravation was not caused by a pre-existing injury. We therefore decline to adopt and follow the original *Misasi* test in evaluating whether a petitioner has made out a *prima facie* case for recovery under the Act. In so doing, we conclude that the special master, and the Court of Federal Claims, erred as a matter of law in applying the original *Misasi* standard to this case. We therefore reverse the

court's denial of Maggie's significant aggravation claim.

■ As a result, this case requires us to articulate the proper test for evaluating whether a petitioner has made out a *prima facie* significant aggravation claim under the Act. We note that the skeleton of the proper test was expressed by the court in *Reusser.* Therefore, we seek here merely to articulate those aspects of the test which *Reusser* did not make explicit. As *Reusser* recognized, to make out a *prima facie* case under the statute, a petitioner must prove two things: First, "that the claimant ... significantly aggravated an injury listed on the Vaccine Injury Table," and second, "that the ... significant aggravation of the injury occurred within the time period prescribed by the Table." *Reusser*, 28 Fed. Cl. at 527.

■ The statute defines "significant aggravation" as:

any change for the worse in a preexisting condition which results in markedly greater disability, pain, or illness accompanied by substantial deterioration of health.

42 U.S.C. § 300aa–33(4). By its use of the phrase "change for the worse in a pre-existing condition," the statute implicitly requires a comparison of the person's pre-vaccination condition with the person's current, post-vaccination condition. Indeed, such a comparison is inherent in the plain meaning of the word "aggravation" itself. Therefore, the first of *Reusser*'s two steps requires, in fact, a three-part inquiry during which the special master must: (1) assess the person's condition prior to administration of the vaccine, (2) assess the person's current condition, and (3) determine if the person's current condition constitutes a "significant aggravation" of the person's condition prior to vaccination within the meaning of the statute. If the special master concludes that the person has suffered a significant aggravation, the special master must then proceed to *Reusser*'s second step and: (4) determine whether the first symptom or manifestation of the significant aggravation occurred within the time period prescribed by the Table. Thus, in our four-step articulation of the test, the first three steps correspond to *Reusser*'s first step, and the fourth step corresponds to *Reusser*'s second step.

■ A comparison of our four-step test with the original *Misasi* four-step test is illuminating. The first two steps of the tests are analogous. Each requires that the special master evaluate the person's pre-vaccination condition and current, post-vaccination condition. This is not surprising because, as noted above, these two steps are practically inherent in the term "aggravation." In contrast, with respect to steps three and four, the two tests differ substantially. Instead of asking whether the person's symptoms would have occurred absent the vaccine, our test hoves close to the statutory mandate, and relieves a petitioner of the burden of proving causation if she can show that the first symptom or manifestation of the significant aggravation of her condition occurred within the table time period provided in the statute. Of course, as the court pointed out in *Reusser*, once a petitioner has made a *prima facie* case, the government may still prevail if it can show, to a preponderance of the evidence, that the pre-existing condition was, in fact, the cause of the individual's post-vaccination significant aggravation.[13]

---

13. We note that the *O'Connor* and *Reusser* opinions appear to forbid application of the *Misasi* analysis (i.e., comparison of petitioner's actual and expected conditions) when evaluating the government's claim that a "factor unrelated" caused petitioner's significant aggravation. Instead, they limit use of *Misasi* to petitioner's rebuttal of the government's "factor unrelated" evidence. We need not decide in this case, however, whether either of these two propositions is correct. In our first opinion, we reversed the decision of the Court of Federal Claims and held that petitioners had made out a *prima facie* initial onset table case. That result required that we evaluate the government's "factor unrelated" evidence. We concluded that the government evidence showed, at best, that Maggie had suffered a brain disorder of unknown origin prior to her third DPT shot. Disorders of unknown origin, we held, cannot constitute the basis of a "factor unrelated" defense. *Whitecotton*, 17 F.3d at 377–78. On this appeal, the government has declined to challenge this decision. Instead, the government has chosen to argue that in no event can this case turn on whether the government has met its burden of showing that Maggie's significant aggravation was caused by a factor unrelated to the vaccine. Therefore, the

As explained above, we decline to adopt the original *Misasi* framework, and therefore reverse the Court of Federal Claims' affirmance of the special master's denial of Maggie's significant aggravation claim. Because the factual assessments and determinations required by the legal test we have articulated differ from those in the *Misasi* test applied in this case, we are unable to dispose of this appeal finally without a remand. We take it that the special master's evaluations of Maggie's pre-vaccination condition and her present condition, required under steps one and two of either scheme, would not be different under our test. Furthermore, although the special master did not make a formal finding with respect to the third step of our analysis, we can discern from his factual findings as a whole that Maggie's present condition certainly constitutes a significant aggravation of her pre-vaccination condition within the meaning of the statute, since she presently suffers from "greater disability, pain, [and] illness" than she did before her inoculation. *See* 42 U.S.C. § 300aa–33(4). With respect to the fourth step of our analysis, however, we are unable to discern from the special master's findings whether or not he would find that Maggie suffered the first symptom or manifestation of her subsequent significant aggravation within the table time period. We therefore are unable to resolve Maggie's claim on the record before us, and remand the case to the special master to resolve this question of fact.

█ Finally, we note that in applying the above-described framework, the permissible scope of the special master's inquiry is virtually unlimited. Congress desired the special masters to have very wide discretion with respect to the evidence they would consider and the weight to be assigned that evidence. The statute therefore provides:

Matters to be considered

(1) In determining whether to award compensation to a petitioner under the Program, the special master or court shall consider, in addition to all other relevant medical and scientific evidence contained in the record—

(A) any diagnosis, conclusion, medical judgment, or autopsy or coroner's report which is contained in the record regarding the nature, causation, and aggravation of the petitioner's illness, disability, injury, condition, or death, and

(B) the results of any diagnostic or evaluative test which are contained in the record and the summaries and conclusions.

Any such diagnosis, conclusion, judgment, test result, report, or summary shall not be binding on the special master or court. In evaluating the weight to be afforded to any such diagnosis, conclusion, judgment, test result, report, or summary, the special master or court shall consider the entire record and the course of the injury, disability, illness, or condition until the date of the judgment of the special master or court.

(2) The special master or court may find the first symptom or manifestation of onset or significant aggravation of an injury, disability, illness, condition, or death described in a petition occurred within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period. Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset or significant aggravation of the injury, disability, illness, condition, or death described in the petition did in fact occur within the time period described in the Vaccine Injury Table.

42 U.S.C. § 300aa–13(b).

Thus, the special master is free to consider evidence from outside the table time period in determining whether an individual suffered the first symptom or manifestation of a significant aggravation of an injury within the table time period. We mention this primarily because the special master does not seem to have considered Maggie's first abnormal EEG, taken four days after the table

government has waived its "factor unrelated" defense in this case.

time period concluded, in reaching his conclusion under the discarded *Misasi* standard that Maggie did not suffer a significant aggravation within the table time period.

For the reasons described above, the decision of the Court of Federal Claims is

*AFFIRMED–IN–PART,* *REVERSED–IN–PART,* and *REMANDED.*